**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| | : | |
| MARKEYE BOYD, | : | **Civil Action No. 15-2210 (SRC)** |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | |
| | : | |
| PLAINFIELD POLICE DIVISION, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

---

**CHESLER**, District Judge

This matter comes before the Court on Defendants' motion for summary judgment. Plaintiff, proceeding pro se, has opposed the motion. The Court has reviewed the papers filed by the parties. It proceeds to rule on the motion without oral argument, pursuant to Federal Rule of Civil Procedure 78.  For the reasons that follow, Defendants' motion for summary judgment will be granted.


I.     **BACKGROUND**

Plaintiff Markeye Boyd ("Plaintiff" or "Boyd") initiated this civil rights action on March 23, 2015. His original Complaint asserted claims arising out of his June 6, 2012 arrest for drug offenses, following a motor vehicle stop in Plainfield, New Jersey. Thereafter, Boyd filed a First Amended Complaint, which added claims based on a separate arrest which occurred in Plainfield, New Jersey on April 1, 2014. The Defendants named in the First Amended Complaint are as follows: Plainfield Police Division, City of Plainfield, Captain Brian Newman, Lieutenant

Kevin O'Brien, Sergeant Christopher Sylvester, Sergeant Troy Alston, and Officer Green (collectively, "Defendants").

Upon a motion to dismiss brought by Defendants, the Court dismissed with prejudice all claims arising out of the 2012 incident as time barred. Defendants had also moved to dismiss the claims arising out of the 2014 arrest. By Order dated July 6, 2017, the Court granted that motion in part, dismissing some but not all claims related to the 2014 arrest. Defendants have now moved for summary judgment on all remaining claims. They are: (1) a federal civil rights claim pursuant to 42 U.S.C. § 1983 for excessive force (Second Count); (2) a Section 1983 claim for false arrest (Fourth Count); (3) a Section 1983 claim for false imprisonment (Sixth Count); (4) a Section 1983 claim for failure to intervene in false arrest (Eighth Count); and (5) a claim for violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, et seq. (Thirteenth Count).

The relevant facts are as follows.

On April 1, 2014, Defendant Kevin O'Brien, then a lieutenant in the Narcotics and Vice Section of the Plainfield Police Division,[1] was on patrol in the 100 Block of Crescent Avenue in Plainfield, New Jersey. He observed a tan Chevrolet Trailblazer (the "Trailblazer") parked in front of 143 Crescent Avenue. Lieutenant O'Brien recognized the driver of the Trailblazer as Jermaine Pennant, based on prior narcotics investigations and arrests.[2] He recognized the individual occupying the passenger seat as Markeye Boyd, also based on prior narcotics investigations and arrests.

---

[1] O'Brien now holds the position of Captain.

[2] In his certification, Captain O'Brien states that his familiarity with Pennant and his prior narcotics arrests also "includ[ed] a search of our computer database." (O'Brien Cert., ¶ 8.)

Prior to the date in question, Lieutenant O'Brien had knowledge that Pennant was reportedly distributing narcotics at the 143 Crescent Avenue address. Specifically, on January 30, 2014, the Plainfield Police Division received an anonymous tip, through the Union County Crimestoppers program,[3] that Jermaine Pennant was selling drugs at 143 Crescent Avenue in Plainfield. On February 23, 2014, Lieutenant O'Brien corroborated this tip through information provided by a confidential informant. O'Brien asserts in his sworn statement that he had previously utilized the informant numerous times and that the information obtained from this informant had led to multiple arrests and convictions.

Thus, on April 1, 2014, when Lieutenant O'Brien saw Pennant sitting in a vehicle parked in front of 143 Crescent Avenue, he decided to continue to observe the vehicle and its occupants. O'Brien states that he saw an unknown male exit the Trailblazer and walk towards the front door of 143 Crescent Avenue, holding a cell phone to his ear and appearing to scan the area. Minutes later, O'Brien observed another unknown male exit the building at 143 Crescent Avenue, walk directly to the Trailblazer, and enter the vehicle through the rear passenger side door. O'Brien states that this man was in the vehicle for approximately thirty seconds and then walked back to the 143 Crescent Avenue building. Immediately thereafter, Pennant drove the car westbound along Crescent Avenue. O'Brien followed the vehicle to the 600 block of John Street.

On John Street, O'Brien saw a man standing on the side of the street. It appeared to O'Brien that as the Trailblazer approached, the man began walking towards the street. O'Brien saw the Trailblazer pull over to the man's location. O'Brien observed this man enter the rear of

---

[3] Defendants explain in their motion that the Crimestoppers program "was established to encourage Union County residents to anonymously share first-hand information pertaining to criminal activity." (O'Brien Cert., ¶ 3.) According to O'Brien's certification, the Plainfield police routinely relies on information obtained through Crimestoppers to conduct "successful investigations." (Id.)

the vehicle, remain inside the vehicle for approximately 30 to 45 seconds, and then exit the vehicle. The man then began walking northbound. O'Brien watched him and, from prior narcotics investigations and arrests, recognized the man as Rashon Faulcon.

Based on the foregoing information, Lieutenant O'Brien contacted two other members of the Plainfield police force, Detective Nuno Carvalho and Officer Eric Groething, and instructed them to detain Faulcon. O'Brien states that Carvalho and Groething entered the area in an unmarked but well-known police vehicle. The police vehicle pulled over on the east side of the street, ahead of Faulcon, and O'Brien saw Faulcon throw a clear sandwich bag to the ground as he attempted to cross the street to move away from the police vehicle. Faulcon was detained, and the sandwich bag was retrieved. The bag contained 49 glassine folds labeled "Cobra," suspected to contain heroin.

In the meantime, O'Brien had advised two other officers, Detective Joseph Mulligan and Sergeant Christopher Sylvester, that he observed a suspected narcotics transaction involving the occupants of the Trailblazer. According to Detective Mulligan, O'Brien instructed him to conduct a stop of the vehicle and place the occupants under arrest. O'Brien recalls that Sergeant Sylvester followed the Trailblazer and gave this instruction to arrest. In any event, Detective Mulligan and another officer entered the area and observed the Trailblazer traveling west in the 700 block of Fourth Street, in Plainfield. As the vehicle passed Detective Mulligan, he recognized the driver as Jermaine Pennant, known to Mulligan from prior narcotics arrests. Detective Mulligan also recognized the vehicle's passenger to be Markeye Boyd, whom he also knew from prior narcotics arrests. Mulligan pulled over the Trailblazer and arrested both Pennant and Boyd.

Pennant and Boyd were transported to the Plainfield police headquarters. There, an officer conducted a search of Boyd's person as part of the booking process. Plaintiff has repeatedly stated, including in his opposition brief, that the search of his person at the police station was conducted by O'Brien, whereas both O'Brien and Mulligan assert in their certifications that the search was conducted by Mulligan. Mulligan also makes this assertion in the police report he prepared.[4]

In his certification, Mulligan describes the search of Boyd's person as follows: Boyd was placed in a room located in the holding cell area of the Plainfield police headquarters. According to Mulligan, a search of Boyd's person was necessary prior to his placement in the detention facility because Boyd was known, from prior arrests, to conceal narcotics on his person. Specifically, Mulligan was aware that in 2012, Mulligan was arrested for a drug crime and found to be concealing narcotics in the cleavage of his buttocks. Detective Mulligan conducted a pat-down search of Boyd. While patting Boyd's pockets, Detective Mulligan felt what he believed to be a plastic bag in the cleavage of Boyd's buttocks. Mulligan then put on rubber gloves and removed the bag from area between the buttocks. He further states that the search of Boyd's buttocks area lasted no more than a few seconds. Mulligan asserts that he did not conduct an anal cavity search, did not instruct any other officer to do so, and did not observe any other officer conduct an anal cavity search of Boyd.

Boyd's version of the search differs in only one key regard: his assertion that an anal cavity search occurred. While Boyd does not take issue with the officer's reaching into his pants during the search and does not dispute that a bag of marijuana was found in between his

---

[4] The Court notes that Defendants have provided proof that they produced in discovery a copy of Mulligan's Investigation Report, which identifies Mulligan as the officer who searched Boyd. Boyd has not named Mulligan as a party to this lawsuit.

buttocks, Boyd asserts that the officer conducting the search then proceeded to insert his finger inside Boyd's anal cavity. Boyd further asserts that the anal cavity search occurred in view of other officers, although he does not identify which officers allegedly witnessed this search.

Boyd has made these assertions not only in his brief in opposition to the motion for summary judgment but also in an on-the-record conference, related to the instant lawsuit, held before Magistrate Judge Cathy Waldor on October 3, 2017. In the course of that conference, Judge Waldor directed Plaintiff to answer interrogatories propounded by Defendants. With Judge Waldor's assistance during the process, Defendants' attorneys read the interrogatories into the record, and Plaintiff provided his answers under oath. In relevant part, the transcript of the conference states as follows:

> Mr. Trelease: Describe in detail your version of the incident or occurrence that gave rise to your arrest and detainment on April 1st, 2014.
>
> The Court: Wait, before you answer that, I didn't -- you understand you're under oath, and you're sworn to tell the truth here –
>
> Mr. Boyd: Oh, I've been telling the truth since I wrote your first letter to you, Your Honor.
>
> The Court: Okay. I just have to institute that.
>
> ***
>
> Mr. Boyd: So then, we were zipping down to the Plainfield police station. I forget the lieutenant name - O'Bryant [phonetic]. O'Bryant states to me, after we get down to the police station, I'm like you all got the wrong guy and everything.
>
> He says to me, oh, no, we don't got the wrong guy. You're the ass-hole man. Okay. He says you like to keep things in your A-hole.
>
> And he says, Face the wall and look straight. And if you turn to even look at me, I'll break your jaw.

So what I then says, Your Honor, was I like this, because they done it to me once already, but this time they're going to do it to me again. And they took me to the blind spot, but I had a witness this time, Your Honor. Jermaine Pennant. We was both locked up together.

So I wasn't compliant at first, Your Honor. And then I complied.

And he put some gloves on. And then he was, like, let me open your butt -- and then I got real uncomfortable, and I resisted. And then the other officers came. And they all stood -- they're not touching me -- all stood. And he went and opened my butt cheeks and went with his finger insider my butt, looking for drugs.

I would like to make clear on record, Your Honor, that a bag of marijuana was in my briefs, not in my butt. So when he shook my underwear a bag of marijuana had fell out. And he says, finally got him. Finally got him. To his fellow officers at hand.

(Trelease Cert, Ex. H, Tr. 16:15-23; 18:20-19:22.)

In response to another interrogatory inquiring where Boyd had concealed drugs in connection with the April 1, 2014 arrest, Boyd stated as follows:

Mr. Boyd: Your Honor, the marijuana was in my butt. In my briefs.

***

Mr. Boyd: No. What I'm trying to say is, you know, through the briefs, you can put it to your butt and hold it. And that's what guys do, Your Honor. With their butt cheeks, they hold it together like that.

(Id., Tr. 94:13-14, 21-24.)

In their interrogatories, Defendants had also asked Boyd where on his person he had concealed narcotics prior to his June 2012 arrest by the Plainfield police. In response, Boyd admitted that he had concealed the drug in his anal cavity. The transcript from the case management conference reads as follows:

Mr. Wenzel: So the question asks -- the question asks how and where on your person you concealed the drugs or narcotics on June 6th.

Mr. Boyd: In my butt. And the records will show too, because we're going to ask for the lab, because you've got to have something --

The Court: Whoa, whoa, whoa. Where did you conceal the drugs?

Mr. Boyd: From 2012?

The Court: Yeah.

Mr. Boyd: Buttocks.

The Court: Wait, wait, wait.
Don't -- so 2012, you concealed the drugs in your cavity?

Mr. Boyd: Yes.

The court: Okay.

(Id., Tr. 92:13-23, 93:8-12.)

The facts concerning the incident leading up to the April 1, 2014 arrest are not in dispute. Moreover, it is uncontroverted that Faulcon, the man who entered and exited the Trailblazer on John Street shortly before Boyd's arrest, pled guilty in New Jersey Superior Court to a charge of distributing a controlled dangerous substance in a school zone. Faulcon admitted that he was distributing heroin on April 1, 2014. Boyd was also charged with several offenses relating to possession and distribution of narcotics. Although the charges were dropped by the Union County Prosecutor upon the court's acceptance of Faulcon's guilty plea, Boyd has admitted that on April 1, 2014, at the time he was arrested and then searched, Boyd was in possession of a bag of marijuana in his underwear, braced in between his buttocks.

## II.   DISCUSSION

### A.  Legal Standard

Defendants bring this motion pursuant to Federal Rule of Civil Procedure 56 seeking

summary judgment on all claims asserted against them in the Amended Complaint. In evaluating

the motion, the Court applies the well-established legal standard for summary judgment.

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that

there is no genuine issue as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

(1986) (construing the similarly worded Rule 56(c), predecessor to the current summary

judgment standard set forth in Rule 56(a)). A factual dispute is genuine if a reasonable jury could

return a verdict for the non-movant, and it is material if, under the substantive law, it would

affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In

considering a motion for summary judgment, a district court "must view the evidence 'in the

light most favorable to the opposing party.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014)

(quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). It may not make credibility

determinations or engage in any weighing of the evidence. Anderson, 477 U.S. at 255; see also

Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

Once the moving party has satisfied its initial burden, the nonmoving party must establish

the existence of a genuine issue as to a material fact in order to defeat the motion. Jersey Cent.

Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). To create a genuine

issue of material fact, the nonmoving party must come forward with sufficient evidence to allow

a jury to find in its favor at trial. Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir.

2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l

Union of Operating Eng'rs and Participating Emp'rs, 134 S. Ct. 773 (2014). The party opposing a motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment"). Indeed, Rule 56(c)(1) expressly requires a party who asserts that a fact is genuinely disputed to support that assertion by:

> (A) *citing* to *particular parts of materials in the record*, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that *the materials cited* do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). If the non-movant fails to "properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Even pro se litigants, such as Plaintiff, must comply with the requirements of Rule 56. Schock v. Baker, 663 F. App'x 248, 252 (3d Cir. 2016) (holding that while the pro se plaintiffs were afforded some leeway, "they were still required to comply with Rule 56.").

In the District of New Jersey, moreover, Local Civil Rule 56.1 imposes an additional requirement on both movants and non-movants related to summary judgment motions. The party moving for summary judgment must file a statement which lists, in separately numbered paragraphs, material facts the movant asserts are not in dispute, with citations to the specific portions of the record supporting those factual assertions. In turn, the party opposing summary judgment "shall furnish, with its opposition papers, a responsive statement of material facts,

addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." L. Civ. R. 56.1(a). Indeed, the local rule warns that "any material fact not disputed [in such a responsive statement] shall be deemed undisputed for purposes of the summary judgment motion." Id.

Defendants point out, in their reply papers, that Boyd failed to file a responsive statement of material facts with his opposition, as required by the local rule. They urge the Court, therefore, to deem all of the facts asserted by Defendants as undisputed and proceed to rule accordingly. Under a strict application of Rule 56 as well as this Court's corresponding local rule, the Court would be permitted to do so. However, in light of the fact that Plaintiff is not represented by counsel, the Court may relax its application of Local Rule 56.1 and instead attempt to draw the facts from sources such as deposition testimony and other parts of the record. Fahnbulleh v. Steneck, No. 15-5075, 2018 U.S. Dist. LEXIS 56581, at *7 (D.N.J. Apr. 3, 2018) (noting that, in light of the plaintiff's pro se status, the court searched the record and the parties' submissions to determine whether anything raised a genuine issue of material fact); Oguguo v. Wells Fargo Bank, NA, No. 14-2383, 2016 U.S. Dist. LEXIS 69717, at *2 n. 3 (D.N.J. May 27, 2016) (noting that district court judges often relax procedural rules for an unrepresented litigant" and "draw relevant facts from the record"). In addition, where the nonmoving pro se litigant provides a written submission, which contains facts that contradict facts in the Rule 56.1 statement, the contradicted facts are deemed denied by the pro se litigant." Athill v. Speziale, No. 06-4941, 2009 U.S. Dist. LEXIS 55446 , at *5 (D.N.J. June 30, 2009); see also Sumner v. Schreck, No. 13-1840, 2015 U.S. Dist. LEXIS 128000, at *8 n.2 (D.N.J. Sept. 23, 2015) (noting although the plaintiff had not furnished a separate statement of material facts, he had referred to certain

specific facts in his opposition papers and thus the court would apply the local rule liberally and deem those specific references as genuine factual disputes).

In the interests of justice, this Court will excuse Boyd's failure to furnish a separate statement of facts. Instead, applying the local rule liberally, it will construe the statements made in Plaintiff's opposition brief as denials of any specifically corresponding facts asserted by Defendants, if the record would permit such an interpretation. Moreover, the Court itself will search the record to determine whether any material facts are genuinely in dispute.

## B. Claims for False Arrest, False Imprisonment, and Failure to Intervene in False Arrest

Plaintiff seeks relief under 42 U.S.C. § 1983 for his allegedly unconstitutional arrest and imprisonment on April 1, 2014 as well as the failure of the Defendants to intervene to disrupt the arrest. These Section 1983 claims stem from the Fourth Amendment, which protects a person from searches and seizures made without probable cause. Beck v. Ohio, 379 U.S. 89, 91 (1964). An arrest without probable cause is a constitutional violation actionable under section 1983. Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995). The imprisonment of an individual based on an arrest without probable cause is likewise unconstitutional under the Fourth Amendment. Id. Moreover, an officer's failure to intervene when a constitutional violation takes place in his presence may subject that officer to liability under Section 1983. Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002). Lack of probable cause is thus an essential element of Plaintiff's claims of false arrest, false imprisonment, and failure to intervene in a false arrest. Groman, 47 F.3d at 634; Palma v. Atl. Cnty., 53 F.2d 743, 755 (D.N.J. 1999); see also Michigan v. DeFillippo, 443 U.S. 31, 36 (1979) ("the Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense.").

Defendants contend that Plaintiff could not, as a matter of law, demonstrate that there was no probable cause for his arrest on April 1, 2014. They argue that they are therefore entitled to summary judgment on Plaintiff's Section 1983 claims for false arrest, false imprisonment, and failure to intervene. The Court agrees. While the existence of probable cause is often a question for the jury, where the Defendants' asserted probable cause is such that no reasonable jury could find that the police lacked probable cause, summary judgment is appropriate. <u>Crock v. Pennsylvania</u>, 397 F. App'x 747, 749 (3d Cir. 2010) (internal citations omitted).

The existence of probable cause for an arrest depends on "whether, at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense." <u>Beck</u>, 379 U.S. at 91; <u>see also</u> <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."). "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." <u>Illinois v. Gates</u>, 462 U.S. 213, 243 n.13 (1983); <u>see also</u> <u>DeFillippo</u>, 443 U.S. at 36 (holding that it is well-established that "the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest."). Thus, probable cause may exist "even in the absence of the actual observance of criminal conduct when a prudent observant would reasonably infer that a defendant acted illegally." <u>United States v. Burton</u>, 288 F.3d 91, 98 (3d Cir. 2002). It is sufficient to support probable cause for arrest if it appears that a person has committed "*any* offense that *could be* charged under the circumstances." <u>Barna v. City of Perth Amboy</u>, 42 F.3d 809, 819 (3d Cir. 1994) (emphasis added).

Here, the record contains ample evidence to support a finding of probable cause for Boyd's arrest. Prior to April 1, 2014, Lieutenant O'Brien had knowledge, from both an anonymous tip provided through the Crimestoppers program and corroborating information given by a trusted confidential informant, that Jermaine Pennant was involved in narcotics distribution at 143 Crescent Avenue. On the date of Boyd's arrest, while patrolling the 100 block of Crescent Avenue, O'Brien observed Pennant sitting in the driver's seat of a vehicle parked in front of the very same address where he was reportedly dealing drugs. O'Brien also recognized Boyd as the vehicle's front-seat passenger. Both men were familiar to him from previous drug arrests. Lieutenant O'Brien's further observations of activity involving the vehicle and its occupants, was consistent with possible drug distribution, based on O'Brien's experience as a narcotics officer and familiarity with the area's high drug crime occurrence. Lieutenant O'Brien informed other Plainfield police officers of the activity he had witnessed. Based on the foregoing facts, Detective Mulligan was instructed to arrest the occupants of the Trailblazer. From the totality of circumstances and information known to Defendants on April 1, 2014, Defendants could reasonably infer that Boyd was engaged in unlawful drug distribution and thus had probable cause to arrest him.

Boyd argues that that probable cause to arrest him for distributing narcotics was lacking because (1) no drugs were in fact found to be in the Trailblazer, according to Boyd; (2) Boyd was found to be in possession of only a single bag of marijuana, which he claims was for his personal use and not for sale; and (3) the criminal charges against him stemming from the April 1, 2014 arrest were later dropped. None of these facts negate the existence of probable cause. The probable cause analysis does not depend on what crime a person is actually charged with, whether a person is later acquitted of the crime for which he or she is arrested, or even whether

the person arrested actually committed any crime. DeFillippo, 443 U.S. at 36; Wright v. City of Phila., 409 F.3d 595, 602 (3d Cir. 2005). The Supreme Court has made clear that "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." DeFillippo, 443 U.S. at 36.

Boyd also argues the arrest was invalid because he was arrested solely in retaliation for a lawsuit he filed against the Plainfield police department and certain of its officers based on a 2012 arrest. This contention is unavailing to defeat summary judgment. First, insofar as Boyd may be claiming that the instant action, which originally set forth claims against Plainfield police officers arising out of a 2012 arrest, is the lawsuit which prompted the alleged retaliation, the Court notes that Boyd's argument makes no sense. This action was initiated in 2015, long after Boyd's April 1, 2014 arrest. Second, Boyd offers no evidence to indicate retaliation. Third, as discussed, the record contains substantial and uncontroverted evidence of probable cause for Boyd's April 1, 2014 arrest.

Plaintiff, in short, cannot establish a lack of probable cause for his arrest, an essential element of his claims for false arrest, false imprisonment and failure to intervene in false arrest. Defendants have demonstrated that they are, therefore, entitled to summary judgment based on these claims.

## C. Excessive Force Claim

Plaintiff alleges that the during search of his person on April 1, 2014, he was subjected to an anal cavity search that amounted to unreasonable and excessive force in violation of the Fourth Amendment of the Constitution.[5] The use of force in the search of Boyd's person is subject to the Fourth Amendment's reasonableness standard. Graham v. Connor, 490 U.S. 386, 396-97. In Graham v. Connor, the Supreme Court held that an officer's use of force is excessive and violates the Fourth Amendment if, under the totality of the circumstances, the officer's actions were not objectively reasonable in light of the facts and circumstances confronting the officer. Estate of Smith v. Marasco, 318 F.3d 497, 515 (3d Cir. 2003) (citing Graham, 490 U.S. at 397). The reasonableness of a particular use of force "must be evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Rivas v. City of Passaic, 365 F.3d 181, 189 (2004) (quoting Graham, 490 U.S. at 396).

To clarify, Boyd does not take issue with the pat-down portion of the search, nor with the searching officer's reaching into his underwear as he removed a plastic bag braced between Boyd's buttocks. Rather, Boyd bases his excessive force claim on the alleged anal cavity search. In pleading Plaintiff's excessive force claim, the Amended Complaint alleges that "Defendants Lieutenant O'Brien and Sergeant Christopher Sylvester, along with another unidentified officer, violated Plaintiff's Constitutional Rights . . . by unlawfully and unreasonably inserting

---

[5] In his opposition brief, Plaintiff attempts to amplify hi excessive force claim. He maintains that while attempting to conduct the search, O'Brien twisted his hands and injured Boyd's hand or wrist. This allegation is not set forth in the First Amended Complaint and therefore will not be considered by the Court as part of Plaintiff's excessive force claim. A complaint may not be amended by briefs submitted in opposition to a dispositive motion. See Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citation omitted).

themselves in Markeye's anal cavity while forcing him against a wall and threatening substantial violence . . .." (Am. Compl., Second Count, ¶ 2.)

The parties, as the factual synopsis above indicates, dispute that the cavity search occurred. Plaintiff has asserted, under oath, that the officer conducting the search put his hands down Boyd's pants, retrieved a bag of marijuana from his briefs, and then "he went and opened my butt cheeks and went with his finger insider my butt, looking for drugs." (Trelease Cert, Ex. H, Tr. 19:15-17.) O'Brien, the officer Plaintiff believes performed the search when he was booked into the Plainfield police station's detention facility, denies that Boyd was subjected to such a search. Mulligan, the officer Defendants maintain performed the inventory and safety search at booking, asserts he did not perform a cavity search.

It is axiomatic that, on a motion for summary judgment, "a district court must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." Podobnik v. United States Postal Serv., 409 F.3d 584, 589 (3d Cir. 2005). Viewing the facts in Plaintiff's favor, the Court assumes, for purposes of this motion, that the anal cavity search occurred. The Court recognizes that Plaintiff has raised a genuine issue of fact pertaining to his excessive force claim.

Defendants argue that they are nevertheless entitled to summary judgment on the excessive force claim on two grounds: qualified immunity and lack of personal involvement in the alleged unconstitutional conduct. The court will address each basis in turn.

1. Qualified Immunity

"'The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555

U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In Saucier v.

Katz, the Supreme Court explained that "[t]he concern of the immunity inquiry is to

acknowledge that reasonable mistakes can be made as to the legal constraints on particular police

conduct." Saucier v. Katz, 533 U.S. 194, 205 (2001). As such, the Court held that, under the

doctrine, an officer is entitled to immunity if his or her mistake as to what the law requires is

reasonable. Id.; see also Pearson, 555 U.S. at 244 ("The principles of qualified immunity shield

an officer from personal liability when an officer reasonably believes that his or her conduct

complies with the law."). "Put simply, qualified immunity protects 'all but the plainly

incompetent or those who knowingly violate the law.'" Mullenix v. Luna, 136 S. Ct. 305, 308

(2015) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

     In Saucier, the Supreme Court established a two-part analysis to determine if an officer is

entitled to qualified immunity. One, a court must inquire whether, viewing the facts of a case in

the light most favorable to the plaintiff, the facts show that the official's conduct violated a

constitutional right. Saucier, 533 U.S. at 201. Two, a court must determine whether the right was

clearly established at the time of the alleged misconduct. Id.; see also Werkheiser v. Pocono

Twp., 780 F.3d 172, 176 (3d Cir. 2015) (setting forth Saucier's two-step analysis for qualified

immunity.)  In its discretion, a court may address the two prongs of the Saucier analysis in either

order. Pearson, 555 U.S. at 236 ("The judges of the district courts and the courts of appeals

should be permitted to exercise their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand."); see also Werkheiser, 780 F.3d at 176 (noting that, under Pearson, the

court may address the <u>Saucier</u> prongs in either order, at its discretion). A defendant's entitlement to qualified immunity is a question of law for the court to decide. <u>Saucier</u>, 533 U.S. at 201.[6]

In this case, the Court begins its qualified immunity analysis with the second prong, which inquires whether the right at issue was clearly established. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" <u>Mullenix</u>, 136 S. Ct. at 308. "'The relevant dispositive inquiry' in making this determination is 'whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*.'" <u>Kopec v. Tate</u>, 361 F.3d 772, 776-77 (3d Cir. 2004) (quoting <u>Saucier</u>, 533 U.S. at 202) (emphasis added); <u>see also</u> Bennet v. Murphy, 274 F.3d 133, 136 (3d Cir. 2001) (holding that the purely legal question presented by the second prong of the qualified immunity analysis is "in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?"). To reach the conclusion that an officer's conduct has violated a clearly established right, the right in question must be defined with particularity vis-à-vis the conduct at issue. <u>Aschroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011). The contours of the right in question must be sufficiently clear such that "every 'reasonable official would [have understood] that what he is doing violates that right.'" <u>Aschroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)) (alteration in original). The Supreme Court has emphasized that, to meet the "clearly established" threshold, "we do not require a case directly on point, but existing precedent must

---

[6] Where there are disputed issues of fact that bear on the question of whether a clearly established right existed and whether the officer's actions were objectively reasonable, the factual disputes must be submitted to the jury. <u>See</u> <u>Curley v. Klem</u>, 298 F.3d 271, 278 (3d Cir. 2002). Here, while there is a factual dispute as to whether Boyd was subjected to a cavity search, the Court may nevertheless proceed with the qualified immunity analysis because it will assume, for purposes of the analysis, that the anal cavity search in fact occurred. Thus, the Court may evaluate whether Defendants are entitled to qualified immunity without submitting the factual issue to a jury.

have placed the statutory or constitutional question beyond debate." Id. (citing Anderson, 483 U.S. at 640 and Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Applying this analysis, the Court concludes that the conduct on which Boyd's excessive force claim is based does not violate a "clearly established" right.

To begin, the Court considers the situation confronting the officer performing the search of Boyd's person on April 1, 2014. According to Plaintiff's version of events, Officer O'Brien conducted a digital anal cavity search in or around the holding cell area of the police station. It is uncontroverted that the search of Boyd's person occurred as part of the booking process upon Boyd's arrest for a narcotics distribution offense. It is further undisputed that immediately before the alleged cavity search occurred, the officer found a bag containing marijuana concealed in the cleavage of Boyd's buttocks. Moreover, Boyd does not dispute that he had previously concealed drugs in his anal cavity and that this fact was known to the officers of the Plainfield police.

Next, the Court looks to existing precedent at the time of the search and asks: were the contours of the constitutional right Plaintiff claims was violated were sufficiently clear that a reasonable officer, confronting the situation described, would understand that proceeding with a manual body cavity search violated that right? The answer to this question is no.

Because Plaintiff claims that the cavity search itself was unreasonable use of force, the Court has considered the Fourth Amendment jurisprudence on searches of detainees and inmates in detention and correctional facilities. The Supreme Court's decision in Bell v. Wolfish and its progeny have made clear that the reasonableness of a search of pre-trial detainees and inmates must take into account the fact that "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." Bell v. Wolfish, 441 U.S. 520, 559 (1979); see also Florence v. Bd. of Chosen

Freeholders, 566 U.S. 318, 332 (2012) (observing that "detecting contraband concealed by new detainees, furthermore, is a most serious responsibility. Weapons, drugs, and alcohol all disrupt the safe operation of a jail."). Thus, in Bell, the Supreme Court upheld as constitutional a prison's policy of conducting visual body cavity searches of all inmates after having seen a visitor. Bell, 441 U.S. at 558-60. In Florence, the Court held that a policy of conducting a visual body cavity search of all arriving detainees that were to be admitted to the prison's general population was reasonable under the Fourth Amendment regardless of the nature of the offense and of the existence of any individualized suspicion that contraband might be concealed.[7]

Florence, 566 U.S. at 324, 339.

With regard to searches invading bodily privacy, the Supreme Court has held that reasonableness must be assessed by considering the totality of the circumstances, "including the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 559. The search must be "limited to the area that is capable of concealing the object of the search." Safford Unified Sch. Dist. #1 v. Redding, 557 U.S. 364, 388 (2009). In Schmerber v. California, a case involving the non-consensual withdrawal of the plaintiff's blood to test for alcohol, the Supreme Court held that intrusions beyond the body's surface are unconstitutional unless there is a "clear indication"

---

[7] The Court recognizes that, unlike the circumstances in the case at bar, Bell and Florence concern blanket policies of conducting searches which, while invasive, did not involve touching. Indeed, the Florence Court noted that "there . . . may be legitimate concerns about the invasiveness of searches that involve the touching of detainees" but refrained from addressing that issue as it was not implicated in the facts of the case. Florence, 566 U.S. at 339. Bell and Florence nevertheless inform the Court's qualified immunity analysis as they bear on the contours as to the scope of permissible body searches of detainees for contraband.

that the evidence sought will be found. <u>Schmerber v. California</u>, 384 U.S. 757, 770 (1966). This "clear indication" requires that there be a "particularized suspicion that the evidence sought might be found within the body of the individual." <u>United States v. Montoya De Hernandez</u>, 473 U.S. 531, 540 (1985).

In this case, Defendants have demonstrated that, based on existing precedent, a reasonable officer would not have known that he was violating clearly established law in conducting an anal cavity search of Plaintiff. Boyd was arrested for a narcotics distribution offense. He was, moreover, known to the Plainfield police officers for a history of drug offenses and for previously concealing drugs in his buttocks. The search occurred when Boyd was taken into custody and was entering incarceration. It is undisputed that in the course of performing a lawful search of Boyd's person, the officer discovered contraband in between Boyd's buttocks. Boyd admits that, at the time of his arrest and subsequent search, a plastic bag containing marijuana was clenched between his buttocks. The record contains sufficient facts to support a particularized suspicion that Boyd might have been concealing drugs in his anal cavity. Based on that suspicion and the totality of the circumstances, the Court concludes that it would not be apparent to a reasonable officer confronting the situation described that proceeding to conduct a manual search of Plaintiff's anal cavity would constitute excessive force or violate the Fourth Amendment prohibition on unreasonable searches.

Plaintiff's opposition to the motion for summary judgment does not address Defendant's qualified immunity argument. The Court recognizes that the Plaintiff is a <u>pro se</u> litigant and thus might not possess sufficient proficiency with legal research to uncover caselaw rebutting Defendant's qualified immunity defense. As such, the Court itself has undertaken exhaustive research of Fourth Amendment jurisprudence on physically invasive searches, with a focus on

cases dealing with individuals placed under arrest and individuals entering or in a custodial setting. This search has been guided by the Supreme Court's decisions explaining what constitutes "clearly established" law for purposes of the qualified immunity standard.

In Ashcroft v. al-Kidd, the Supreme Court emphasized two critical requirements for a right to be clearly established. One, it held that for a constitutional protection to be "clearly established," such that a reasonable officer would or should know that his or her conduct violates a right, prior caselaw must provide notice of the violative nature of the conduct with precision. The Court held: "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). Emphasizing this point, the Court further stated that "[w]e have repeatedly told courts . . . not to define clearly established law at a high level of generality." Id. at 742 (citation omitted). Broad principles about the Fourth Amendment's reasonableness standard will not illuminate question of whether a reasonable official would have understood that his or her conduct is unlawful. Id. Two, the Supreme Court held that the right at issue must be set forth by "controlling authority"—precedent set by the Supreme Court or by the Court of Appeals in the applicable jurisdiction—or, absent controlling authority, by "a robust 'consensus of cases of persuasive authority.'" Id. at 741-42 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)).

Though far from controlling authority, a recent decision by a federal district court recently found that it is clearly established that manual body cavity searches, conducted without suspicion, violate the Fourth Amendment. See Monroe v. Gould, No. 16-2885, 2019 U.S. Dist. LEXIS 41979 (S.D.N.Y. Mar. 14, 2019). Accordingly, in Monroe, the district court denied summary judgment on a Section 1983 claim on the grounds that that qualified immunity was not warranted. Id. at *13. The underlying facts were as follows: The plaintiff, Monroe, was a

passenger in a motor vehicle operated by a companion, Robert Rodriguez. Id. at *2. Shortly after Monroe exited the vehicle, Rodriguez was arrested for a motor vehicle violation. Id. Monroe was stopped by the police and frisked. Id. at *3. After the police discovered a plastic bag containing cocaine inside the Rodriguez's vehicle, an officer performed a second frisk of Monroe and found a knife in his pocket and marijuana in his possession (though where on Monroe's person the drugs were found was not specified). Id. Monroe was arrested and, later that night, subjected to a strip search at the police station. Id. According to the record, the officer put on latex gloves, "spread plaintiff's buttocks with his hands, and as plaintiff described the search, [the officer] performed a visual inspection and 'his finger penetrated plaintiff's rectum.'" Id. (quoting plaintiff Monroe's deposition testimony). The plaintiff was then fingerprinted, photographed, and transported to the county jail. Id. The district court held that the defendant officer who performed the manual body cavity search was not entitled to qualified immunity because he had performed the most invasive type of search "without reasonable suspicion that plaintiff was concealing contraband inside his body." Id. at *10. The Monroe court noted that the plaintiff had been arrested for misdemeanor, not felony drug possession, and reasoned that although marijuana and a weapon were found on his person, nothing in the record indicated that the plaintiff might be concealing contraband in a body cavity. Id. at *10-11. Regarding the lack of reasonable suspicion, the court stated that "Defendants do not point to plaintiff's physical appearance, apparent discomfort, or any suspicious actions or other articulable facts which might have suggested he was hiding something inside his body." Id. at *12.

The Monroe court relied on two precedential opinions in its qualified immunity analysis. Initially, it cited the Supreme Court's decision in Schmerber v. California, which it characterized as holding that "police searches within the body require a special heightened standard." Id.

(citing Schmerber, 384 U.S. at 770). It also cited the Second Circuit's decision in Gonzalez v.

Schenectady, 728 F.3d 149 (2013), as recognizing that New York state law, as set forth People v.

Hall, requires a heightened standard of suspicion for manual cavity searches. Id. at *12-13 (citing

Gonzalez, 728 F.3d at 161-62 and People v. Hall, 10 N.Y.3d 303 (2008)). Based on these

opinions, and taking into account the facts of case before it, the Monroe court concluded that "it

was not objectively reasonable for [the defendant officer] to believe this suspicionless manual

body cavity search was lawful" and therefore found that the defendant officer was not entitled to

qualified immunity. Id. at *13.

     Monroe's analysis does not alter this Court's conclusion as to Defendants' entitlement to

qualified immunity. This case presents a factual scenario which is distinct from Monroe in

several key respects. In particular, the indisputably lawful pat-down search of Boyd's person at

the police station had revealed a bag of drugs hidden between Boyd's buttocks. Moreover, as

Boyd himself admits, he had previously concealed drugs in his anal cavity when he was arrested

by officers from the very same police department. It is not disputed that this fact was known to

Officer O'Brien at the time of the search. None of these facts, which could support a reasonable

suspicion of concealment of contraband in the anal cavity, were presented in Monroe.

     In addition, the Court notes that the Monroe court reached its conclusion that the cavity

search was "clearly established" as unconstitutional without citing a precedential opinion

concerning a similar set of facts, that is, where the contours of the right at issue were precisely

defined. Indeed, in Gonzalez, the Second Circuit decision representing binding authority on the

Southern District of New York court, the Court of Appeals actually held that the defendant

police officers were entitled to qualified immunity on a Section 1983 claim based on a body

cavity search. Gonzalez, 728 F.3d at 162. Like the case at bar, Gonzalez also involved a search

conducted at a police station following the defendant's arrest for narcotics distribution. Id. at 153. While performing a visual examination of the plaintiff's anal cavity, the officers observed a "little plastic bag sticking out . . . of [his rectum." Id. (alteration in original). The plaintiff maintained that one of the officers inserted his fingers in the plaintiff's rectum and removed the drugs, while the defendants claimed that plaintiff was instructed to remove the bag himself. Id. The Gonzalez court reasoned that the right at issue was *not* clearly established because prior to the search, there was no precedential authority holding that "the Fourth Amendment is violated by a suspicionless search (strip search or visual body cavity search) of a person arrested for felony drug possession." Id. at 161. The Second Circuit expressly addressed the New York Court of Appeals' decision in People v. Hall, which required "specific and articulable" suspicion before an officer may conduct an invasive search. Id. (quoting Hall, 10 N.Y.3d at 311). It rejected Hall as insufficient to support the proposition that the search at issue in Gonzalez violated a clearly established federal rule. Id. At the outset, the court noted that the search post-dated Hall. Id. More importantly, however, the Second Circuit discounted the strength of the state court decision with regard to the "clearly established" question because "[i]t is not a ruling of the Supreme Court or this Court." Id. at 161. The Second Circuit observed, moreover, that "not one case cited in Hall said that an officer needs particular, individualized facts to conduct a visual body cavity search." Id. The Gonzalez court concluded that, even if a reasonable officer were familiar with the existing jurisprudence, he or she would not have understood that the cavity search following a felony drug arrest was unlawful. Id. at 162.

In its independent research, this Court has applied the qualified immunity principles, as articulated by the Supreme Court. It has uncovered no Supreme Court case, Third Circuit authority, or consensus of other federal Courts of Appeals which would indicate that the cavity search at issue, as described by Boyd, violated a clearly established right under the Fourth Amendment.[8] For the foregoing reasons, Defendants have demonstrated that they are entitled to qualified immunity on Plaintiff's Fourth Amendment excessive force claim. Accordingly, the Court will grant summary judgment in favor of Defendants on the excessive force claim.

### 2. Personal Involvement

Defendants also argue that summary judgment must be granted as Plaintiff has proffered no evidence linking them to the alleged anal cavity search. "A defendant in a civil rights action must have personal involvement in the alleged wrongs, liability cannot be predicated solely on the operation of <u>respondeat</u> <u>superior</u>. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted). The First Amended Complaint explicitly directs the excessive force claim against two Defendants: O'Brien and Sylvester. Defendants correctly argue that the record is devoid of evidence that Defendant Sylvester was involved in the search

---

[8] The Court notes that an opinion filed by the Sixth Circuit Court of Appeals just two days ago involved a set of facts in which the plaintiff alleged, among other things, that the defendant officer had subjected him to an unlawful manual anal cavity search at the police station while plaintiff was being booked into jail. <u>See</u> <u>Campbell v. Mack</u>, No. 18-2156, 2019 U.S. App. LEXIS 16777, at *7-9 (6th Cir. June 4, 2019). Neither the Sixth Circuit, nor the district court decision on appeal, reached the issue of whether the defendant officer was entitled to qualified immunity on the Fourth Amendment cavity search claim. <u>Id.</u> at *11, 26 n.6. <u>Campbell v. Mack</u> sheds no light on the qualified immunity issue presented in this case, and thus this Court has not included the opinion in its analysis.

of Plaintiff's person. Indeed, insofar as Plaintiff's First Amended Complaint may be construed as asserting the excessive force claim against any Defendant, other than O'Brien, summary judgment is warranted based on the lack of any evidence whatsoever that these individuals had any personal involvement.[9]

In short, Plaintiff has failed to come forward with sufficient evidence to create a genuine issue as to the personal involvement of all but one named Defendant in the alleged constitutional violation. To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. Anderson, 477 U.S. at 250. The summary judgment standard, as interpreted by the Supreme Court is clear: Once the moving party discharges its burden of demonstrating no genuine issue as to material fact, if the non-movant comes forward with evidence which is "merely colorable" or "not significantly probative," the court may grant summary judgment. Id. at 249-50. For this additional reason, summary judgment on the excessive force claim will be granted in favor of Defendants Newman, Sylvester, Alston, and Green.

**D. Claim for Violation of the New Jersey Civil Rights Act**

Plaintiff has also asserted a state law civil rights claim pursuant to the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, et seq. While this claim provides no independent basis for the Court's exercise of subject matter jurisdiction, the Court had, thus far, exercised supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367(a), as it was "so related" to the claims on which the Court's original jurisdiction was predicated that it formed part of the same

_____

[9] As to O'Brien, the Court acknowledges that Boyd has consistently maintained that O'Brien is the officer who performed the search. However, for the reasons expressed earlier in this Opinion, O'Brien is entitled to qualified immunity on the excessive force claim.

case or controversy. The Court's grant of summary judgment on all Section 1983 claims, however, disposes of the claims on which the Court's original jurisdiction is based. Pursuant to 28 U.S.C. § 1367(c), the Court concludes that its continuing exercise of jurisdiction over the state law claim would not be appropriate.

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." The Supreme Court has held that once federal claims are dismissed, a federal court should "hesitate to exercise jurisdiction over state claims," unless circumstances justify this exercise. United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); see also New Rock Asset Partners, L.P. v. Preferred Entity Advancements, 101 F.3d 1492, 1504 (3d Cir. 1996) ("once all federal claims have been dropped from a case, the case simply does not belong in federal court."). In its discretion, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over the remaining state law claim. The Court will accordingly dismiss Plaintiff's claim under the New Jersey Civil Rights claim without prejudice, so that it may be re-filed in the Superior Court of New Jersey, within the thirty-day time period provided by 28 U.S.C. § 1367(d).

**III.    CONCLUSION**

For the reasons set forth above, Defendants have demonstrated that they are entitled to summary judgment on all remaining Section 1983 claims, pursuant to Federal Rule of Civil Procedure 56(a). Their motion for summary judgment on those claims will be granted, and the New Jersey Civil Rights Claim will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c). An appropriate Order will be filed.

____s/ Stanley R. Chesler____<br>
STANLEY R. CHESLER<br>
United States District Judge

Dated: June 6, 2019